Good morning, Your Honors. Tara DeVito for Defendant and Appellant Ralph Bell. Excuse me, counsel, my ears are all messed up from the airplane flight, and it's hard to hear. Could you talk loud? Loud and clear. Sorry, Your Honor. I thought I was. Not your fault. It's me. Your Honors, addressing the sentencing issue first in this case, it appears evident, at least to the defense, that in light of Blakely and Booker-Fan-Fan and then this case, will call for a remand for a new sentencing hearing. This is a case where the judge said that they've – the judge said that – I can't remember which judge it was. He or she felt badly because she was constrained by the guidelines. Yes. It was Judge Trevisan, Your Honor. Trevisan. And he said during the sentencing hearing he had already minimized the sentence as much as he could and felt constrained by the fact that he had no discretion left under the sentencing guidelines to provide a more meaningful sentence. And what – is it possible that Mr. Bell has already served his maximum sentence? No. He's still incarcerated. Well, I mean, in the event of a new sentencing hearing, I'm not sure. Because, Your Honor, there's a number of different ranges that could be applied, and within those ranges, Judge Tabrizki now has the discretion to sentence at the low end or the high end. It would depend on what he chose to do. But if he chose to sentence at the low end, would your client be released from prison? He could very well be, yes. I won't address that in the program of the Court. Is that right? I may be remembering the wrong case, but I thought we're talking tend to serve because it's felon in possession, the guy has a record. Is that right? That is correct, Your Honor. But under Ameline, we're not just looking at the classic Blakely situation where it's – Ameline's not final yet. The mandate hasn't issued. I will. It may be subject to an en banc. Yes. I understand that, Your Honor. Let's talk about Booker Fanfan. I'm sorry? Let's talk about Booker Fanfan. Under Fanfan, your remedial sentencing. Right. That Justice Breyer said. We all know we have to follow that, right? Yes, exactly. So following what Justice Breyer set forth, in light of the entire decision in Booker Fanfan, the reasoning of Ameline is really what I'm addressing, not the precedential value of that case. Ameline says not only that cases have to be sent back for resentencing where district courts did rely on factors that weren't embraced by a jury's verdict, but also in light of Booker and Fanfan, a district court can now consider grounds for departure. And it seems to me that's what Judge D'Abrisian was really looking for. I have no problem with that. I was just wondering about whether the fellow is entitled to get out right now. No, I don't think so, Your Honor. I'd like to say yes, but based on how long this case has been around, I don't think in light of his criminal record it's going to go that low in the sentencing range. My concern is that whether if this case is a case that needs to wait for Ameline to be final before we would remand, or whether in light of the district court's statements and other issues in the record, his pre-conviction rehabilitation, for example, we should do a cast or remand now. Well, Your Honor, because of the fact that we know the base has been enhanced by four levels that shouldn't have been implied, we already know a sentencing remand is required. So therefore, I believe, yes, the Court can send this back now, even before Ameline is final. Even without Ameline, sentencing, resentencing is required in this case. I submit to you that the only thing that Ameline may clarify is, if clear error review is the standard that we're applying here, does Mr. Bell lose on that ground? Well, no, not at all. What were the – do you recall exactly where or what the judge said, what his words were, where he basically said, gee, I wish I didn't have to do this, but I have to under the guidelines? Yes, Your Honor. That's your key words for getting a new sentencing, I think. In the supplemental opening brief, I quote the Court, and I'm trying to find it for the Court. I'm sorry, Your Honor, I – oh, I beg your pardon. It's in the supplemental opening brief, which was filed July 28th of 2004, on page 23 – no, page 13, my reading glasses are giving me away. There it is. I've got it. It's also excerpts of record page 340. Yes, that's what I was looking for. They've taken everything away from us now to impose a sentence, which I think is needed. I've done everything to minimize the sentence that the discretion left to me as a Federal judge lets me. Okay. Now they gave it back. Let me ask you about a couple of other things. Yes. Are there any statutory mandatory minimums that are going to constrain this? I'm sorry, Your Honor, I haven't looked at that. I know there was the statutory maximum that could be imposed, which is what was imposed. I'm not sure about minimums. My recollection – I have a vague recollection that there is a statutory mandatory minimum likely to affect this, but I don't recall seeing it in the briefs anywhere. You know, I'm concerned that the Court is asking questions about whether my client is entitled to an immediate release and whether there's a statutory minimum. If the Court would like, I'd be very happy to provide supplemental briefing by – We'll let you know if we need it. I've got another question, too, on the merits part of the appeal. My impression of outrageous government conduct is that it's a category that has been and it's basically an empty set. The most outrageous government conduct is never categorized by the courts as outrageous government conduct. As I recall, there's this one case where the government sent a beautiful woman to seduce a guy, and after he fell in love with her, to sell her some dope, and that wasn't outrageous. I don't remember seeing anything outrageous. I don't think you had a case that was like this case where a court said it was outrageous, did you? No. No, Your Honor. That's true. The defense bar is saddled with the fact that there's this doctrine out there of outrageous conduct and very little case law that we can rely on and point to and say, here's the outer boundary of what's considered outrageous or here's the least that can happen without being considered outrageous. In terms of this case, the Court's quite familiar with the facts. In essence, the ATF agent just went along with what Sandoval, the practicing drug addict, said, let's do. Let's do this. Well, it looks like he has plenty of predisposition. I mean, he had guns all over the place. I beg your pardon? Sandoval? He had guns in the car, guns at home. You know, the problem with that, Your Honor, and by talking about predisposition, I think we're moving over to the entrapment argument more than outrageous conduct. Yeah. You're trying to make it like Jacobson where it's entrapment as a matter of law. Of course. But in terms of having guns all over the place, three guns were involved. My client sold one, but the government didn't charge that as a specific instance of felon in possession. And as I say in the briefs, that's probably because it occurred at a point where that was much more susceptible, perhaps, to an entrapment defense. But if the Court looks at the facts, again, the government had to ask Mr. Bell three times to sell its agent a gun before Mr. Bell finally produced that first gun. But there's nothing like Jacobson where there is no evidence that this farmer was even in the market for child pornography until the government kept imposing selling efforts on him. Well, no, Your Honor. If I may disagree, if you look at Mr. Bell's probation report, there's no firearm use in his past background. He doesn't have the felonies. He was guilty of his theft offenses. His drug-related offenses were apparently committed without the use of a firearm. And it's only Sandoval's testimony to Sandoval repeating what he said to Carr, the ATF agent. He said, I know a man who would sell us a gun. I know he has access to guns. But how? How does he know that? There's nothing in Mr. Bell's background objectively that indicates he was a seller or a holder of firearms. So when the Court says guns are all over the place, I don't think that's quite true. There were two specific instances when Mr. Bell was in possession of a gun. He was in possession, not selling the guns that he's convicted of, right? Right. Exactly. And he has the guns in his car and had them in his car before the guy that knocked him out did anything, or at least independent of anything that that fellow did. I'm sorry, Your Honor. I think you may be misstating the record. There's no indication. Am I mixing up cases? I think so. I don't believe the record says Mr. Bell had these guns in that car before Sandoval came along. The record's silent on that point. Or at least independent of when Sandoval came along. I mean, Sandoval didn't ask him to have the guns in the car, did he? Yes. Yes. The second grouping of guns, the two guns together, the one that's actually charged in the indictment, that occurs at the very end of the fact pattern. Mr. Bell had them in the car he was driving the day he was finally arrested. It was the day he was supposed to participate in this home invasion robbery. And he showed up and was arrested, and in the car at that time were two guns wrapped in a pair of, I think, a pair of jeans, and then some duct tape and other things that the government has argued Mr. Bell intended to use in a home invasion robbery. But, Your Honor, unless I'm mistaken, I don't think there's anything in the record that indicates when those two guns were placed in the car. Didn't Sandoval disappear after the first gun sale? Well, he reappeared. He went to Mexico. He told everyone where he went after the fact. And he went out of the country against the ATF handlers' specific instructions. And we know he committed – well, I don't know that he committed a felony in Mexico. I don't know what he did in Mexico when he shot this man in the chest. It would have been a felony had he done it here. Yes, he disappeared for a while, and he was in the hospital for a while with his family. So all the discussions about the home robbery and so forth occur with the agent and with your client, with Sandoval, nowhere nearby? No, I believe Sandoval was still inducing this act. If the Court recalls, in the fact pattern, Sandoval was in the hospital and asked Mr. Bell to come visit him. And Mr. Bell did, and apparently another conversation took place there, or after Sandoval was released from the hospital, more happened after that. But at any rate, it was – it was Sandoval, according to the record, who kept elevating the severity of the felony in question, because Mr. Bell did sell a gun to the ATF agent. That was the first firearm that was involved. He wasn't arrested at that time. He could have been for selling a gun, but he wasn't, because Sandoval persuaded this ATF agent that he could convince Mr. Bell to participate in a home invasion robbery. And then Sandoval made it a home invasion robbery where drugs were involved. It was essentially Sandoval running the whole show. Does the Court have any other questions? I'll reserve my time for rebuttal. Roberts. Thank you, counsel. May it please the Court, I'm Assistant United States Attorney Cheryl Murphy, and I'll be arguing on behalf of the government this morning. I would like to address – focus mainly on the two merits-related issues here, both the crime-related issue and the entrapment issue. With respect to the sentencing issue, however, I'd just like to comment briefly on some issues that were raised. There is no statutory mandatory minimum in this case as relates to the count of conviction. There was a 924C count charged, but that was dismissed by the district – or, rather, the district court acquitted Mr. Bell of that count. So the only count of conviction does not have a mandatory minimum, although I don't have the Guidelines chart before me. Even if we go with just the base offense level, which would be offense level 24, and the defendant's criminal history category, which I believe was the highest criminal history category there is, based on my recall, I don't believe that he has served the low end of the Guidelines sentence. I can't be perfect. It sounds to me as though we ought to send it back because the district judge really wanted to give him a break and felt like he couldn't. I will admit, Your Honor, Judge Tavrizian was not pleased with – with his lack of discretion in this case, and I think that is important. And I would simply note for the government – for the Court that under Amaline II it does appear that this case would fall within the remand rule, although, as the Court noted, that case is not final yet. I believe the government's deadline as far as whether to seek review of that opinion is tomorrow, so – There's only one circuit that said that plain error review standards aren't met, and that's the Eleventh Circuit. Every other circuit has held that remand is appropriate because of the nature of the sentencing schemes that we're talking about, mandatory versus discretionary. I assume that's the one case that your government's relying on. Yes, Your Honor. And really my only request is that the Court would wait to see what happens with Amaline II, given that under – under any circumstances the defendant is facing a considerable amount of time. But do you understand the nature of the error that the Booker case found, the nature of the Sixth Amendment error? Yes, Your Honor. What is it? The nature of the Sixth Amendment error that the Booker case found was that the defendant was denied the opportunity to have mandatory sentencing factors determined by a – determined by a jury rather than by the Court. Right. So this case, it's the – the mandatory nature of the scheme as opposed to the advisory nature of the scheme that's the precise Sixth Amendment violation. Correct. Right? Correct. Well, doesn't this case just cry out, given what Judge Teresian said, for resentencing? I – I think the Court is – has a very strong point on that, yes, Your Honor. And that's why I said the Government would just simply wait – request that the Court wait until Amaline II is – is resolved. The problem with that is that the way our Court operates in en bancs is that Amaline II might not be resolved, which actually would be III at this point until, you know, for six months. It could be a little more. The Supreme Court might decide to give us a little guidance. They have before. Yeah. It could be quite a while. That is true, Your Honor. And on that point, I would submit the sentencing issue to – to the Court on that point because I would like to use the remainder of my time to address the – the outrageous government conduct and the entrapment claims. As the Court noted, the outrageous government conduct doctrine is a very narrow doctrine. And there have been some cases where courts, both the Ninth Circuit and another circuit, have found in two cases conduct that was sufficiently egregious as to meet that standard. And the conduct that we have in this case, which at most amounts to passive tolerance of an unsavory informant, simply doesn't rise to the level of outrageous government conduct. I think it's important to note that both with respect to the – Do you have any one site closely in point that – Well, yes, Your Honor. The case that – The government did something like that? Well, there are cases where the government did worse than this. The case that the Court referred to earlier, the Simpson case, where Judge Hatter found that the FBI and the government had engaged in deliberate ignorance of the informant's continued sexual contact with the defendant and continued drug use with the defendant. And this Court found that even that, even deliberate ignorance, did not rise to the level of outrageous government conduct. Outrageous government conduct requires some affirmative direction by the government for – that amounts to basically engineering a crime from start to finish. And in the two cases where the courts have found outrageous government conduct, the government has basically been on both ends of the defendant. For example, in the Twigg case, the government pressured the defendant into manufacturing methamphetamine, provided the supplies, provided a manufacturing location, provided a meth cook, and provided the purchasers. That's nowhere near what we have in this case. In this case, when we focus on the count of conviction, possession of a firearm by the felon, the government really simply relied on an unsavory character to identify a suspect and then provided that suspect with the opportunity to commit an offense, which the suspect willingly did. It's important to note here that with respect to both outrageous government conduct and the entrapment issue, the facts are to be viewed in the light most favorable to the government. And the facts, as alleged by the defendant here on appeal, simply don't fit within that view. First of all, sound of all, the informant did not ask Bell to visit him. We don't – sound of all, the informant did mention to the undercover agent that he went to Mexico and was engaged in this shooting at one point following – I believe that was even following the defendant's arrest, but certainly following the informant's last contact with the defendant. The undercover agent attempted to verify whether sound of all had in fact engaged in that activity and was unable to do so. But in any event, that conduct of the informant doesn't relate to his interaction with the defendant and the defendant's willingness, predisposition, and the lack of inducement to engage in this conduct here. Also, with respect to whether the investigation was directed by the informant or directed by Special Agent Carr, again, when viewed in the light most favorable to the government, the facts indicate that Special Agent Carr was the one who directed this. Special Agent Carr and the informant testified that they discussed at their initial meeting, when sound of all was signed up as an informant, they discussed the types of crimes that the ATF was interested in investigating and they discussed the types of crimes about which sound of all had information. This discussion included both sales of firearms and home invasion robberies at that initial point. Now, when sound of all first identified the defendant Bell to the undercover agent, it was with respect to selling firearms. Granted, it was during the course of the investigation, during the first three meetings, in between the first three meetings with the defendant, that the informant then mentioned to the undercover agent that Defendant Bell was also interested in committing home invasion robberies. Home invasion robberies are among, are way up at the top end in terms of seriousness of danger. Yes. Of crimes. Remind me of the details of whose idea that was and how that came up. Well, at the initial meeting, the informant and Carr discussed the fact that the informant had participated in home invasion robberies on behalf of LAPD previously as an informant. Sound of all said that sound of all had participated in them. As an informant for the LAPD. He had worked home invasion robberies. Yes. And Special Agent Carr indicated at that initial meeting that that was one of the types of crimes for which the ATF was interested in receiving information from the informant. Fast forward a little bit and the informant identifies the defendant Bell as a gun dealer to Special Agent Carr. And they began the investigation with respect to Defendant Bell as far as his ability to sell firearms. There's an initial meeting on May 30th where the informant is wired up. Hold on. You're telling me the whole story here and it's not focusing on my question. Let me make my question clear. It looked to me as though one way of looking at this is Bell sells guns under the counter. And Sandoval nails him on that. But that the home invasion robbery was completely Sandoval's idea. Bell goes along with it. Is that right? That is not correct, Your Honor. Sound of all involvement in the home invasion robbery was limited to two facts. First, he identified Bell to Special Agent Carr as, by the way, as well as selling guns, this guy, Defendant Bell, is willing to participate in home invasion robberies. Sandoval's second involvement was his mere presence at the June 5th meeting where Special Agent Carr and the defendant discussed the potential home invasion robbery. From then on, the home invasion robbery scheme was entirely limited to Special Agent Carr, Bell, and the two associates that Bell brought with him to various meetings. It was Special Agent Carr who portrayed to Bell the fact that he was a disgruntled drug courier who wished to rip off the narcotics from his boss because he felt he wasn't being treated properly. And at all of the subsequent meetings, it was Special Agent Carr and the defendant who discussed the home invasion robbery. After that initial meeting and the initial introduction, Sandoval was cut out. Now, Sandoval reappears at the meeting at the hospital, which is later in June. I've forgotten the exact date. But that meeting is not, contrary to the representation earlier, that meeting was not initiated by Sandoval. That meeting was initiated by Special Agent Carr, who told Bell, Special Agent Carr and Bell had had conversations about where is Sandoval. And they determined that Sandoval was in the hospital and they agreed to meet in Sandoval's hospital room. Thereupon, Special Agent Bell and Carr, I'm sorry, Special Agent Carr and Defendant Bell discussed the home invasion robbery as well as additional sales of firearms in the informant's presence. But the informant was in and out of consciousness and was not an active participant at that point. With respect to the entrapment issue, if I may, again, when viewed in light most favorable to the government, the government did present particularized evidence that both Bell was predisposed not to sell firearms as the defense contends, but that he was predisposed to possess firearms, which is the crime of conviction. And second, that the government did not induce him to do so in any way. And I would like to make one other correction to the record, which is there was a statement that there's no evidence of firearm use in the defendant's background, and that's not correct. One of the defendant's prior felonies was robbery with a firearm, and that's reflected in paragraph 79 of the pre-sentence report. It's also a conviction to which the defendant admitted prior to the beginning of trial in a colloquy with the court in order to admit the predicate for the felon in possession charge. Other than Sandoval's comments, what evidence is there that Bell was involved in gun sales the last eight years before he meets Agent Carr? Well, there's no particularized evidence that Bell was involved in gun sales other than his willingness to sell guns to Special Agent Carr. And his own admissions in his testimony that what he wanted to do in this case was sell guns to Special Agent Carr. Which is supposedly Sandoval's idea in the first place. Sandoval tells Bell he can rip off Carr by selling him guns for more than they're worth, but he doesn't know any better, something like that? Well, Sandoval tells Bell that he has this rich, white, preppy guy who wants to buy guns, and that because he has money to buy guns, the defendant can make money by selling to Special Agent Carr. And Bell claims Carr, that Sandoval provides the very first gun? Correct. Bell did claim. Which is not charged. Which is not charged. Although, I must say that the reasons that the government didn't charge that, I think, are not to be considered by this Court. However, I will say, since I was the trial court prosecutor, the reasons that that crime were not charged is simply that the government viewed that as simply another instance of felon in possession. When we already had the better instance of felon in possession on the date that he was charged, when he showed up for the two guns and when he showed up for the robbery. The government's entire real focus on this case, and I think the defendants in the district court as well, were the more serious charges, the narcotics conspiracy, the Hobbs Act conspiracy, the 924C. And the felon in possession was really a minor charge when viewed in the case as a whole. So, when viewing the case that way. And the jury saw your other charges, 11 to 1 is not guilty. The, I don't believe there was a count on the record. I might be mistaken about that, but I don't believe there was a count on the record. There was some commentary at later proceedings that either one of the parties or the court believed that was the count, but the jury has never officially counted. But you're correct. The jury was not able to come to agreement on the three more serious charges, certainly. Were they instructed on the entrapment defense? Yes, they were. They were. An additional piece. It looks like the jury had a real bad opinion of Sandoval and of the way the government used him. And they only convicted Bell on the one thing where there was just no way around it. There are the guns and there was Bell with the guns. Well, I would submit, Your Honor, that we don't know really what the jury was thinking. Well, you never know for sure. They may have been offended by the sting operation. I mean, but you're correct that the only thing that they came up with a conviction on was the felon in possession. And they were presented evidence about that, of the entrapment issue, and they were instructed on the entrapment issue. And there was, in addition to the defendant's character and reputation, there's the fact that the defendant admitted all along that he was engaged in this enterprise for profit. What he wanted to do all along was make money off of Carr. Tell me in a sentence or two, just so I don't lose it. Why is there evidence that Bell was predisposed to possess those two guns, independently of Sandoval setting them up for the phony home invasion robbery? Independent of Sandoval and the home invasion robbery, prior to when that issue occurred, Bell was not willing to sell a firearm, or more than one firearm, to Special Agent Carr. So that action alone indicates a willingness on his part, at least. And then he, on the same date as the home invasion robbery conversation was first initiated with the defendant, that's the same date that he did, in fact, sell a firearm to Special Agent Carr. Proceeding from that point, all of the meetings with Special Agent Carr, the defendant, through his words and actions, indicated that he was willing to continue to sell guns to Special Agent Carr. And the fact that there were multiple meetings and that he did not immediately provide the gun doesn't necessarily indicate either a lack of predisposition or that he was reluctant in any sense and needed to be persuaded by the government. In fact, Bell says on a number of occasions, the first occasion he didn't have the gun because the police had visited his supplier and his supplier was spooked and didn't want to have contact with guns at that immediate time. But he reassured that the conversation that was recorded, that was the conversation on May 31st. Yes, that was recorded. It was with the informant. Special Agent Carr was not present there. During later conversations that were recorded with Special Agent Carr, Bell again tells him, no problem, I can get you the guns. He doesn't, he doesn't ever express to Special Agent Carr that he doesn't want to possess guns, that he doesn't like firearms, that he doesn't want to be involved with firearms at all. He only comes up with that version of the story later at trial when he still admits that he wanted to sell guns to Special Agent Carr. He just couches this in sort of a reluctance to commit the home invasion robbery. If there are no further questions. Thank you, Your Honor. Thank you, Counsel. Counsel. Your Honor, I'm not sure if this is a truly critical point, but with respect to the moment in time when Sandoval was in the hospital, during the government's case, Carr testified that he met Mr. Bell there in Sandoval's hospital room. During the defense case, Mr. Bell testified that Carr, the ATF agent, contacted Mr. Bell and arranged to meet in Sandoval's hotel room or hospital room. But during the defense case, Mr. Bell's wife, Mrs. Epps, testified that Sandoval called their house, told her he was in the hospital, and asked to have Mr. Bell come see him. The defense agrees that in a sufficiency analysis, that particular fact would have to be construed against the defense. Nevertheless, it's there in the record that Sandoval was part of the process of stringing Mr. Bell along, and Sandoval was making himself still available to Mr. Bell, I submit, because the government was concerned that Mr. Bell might have been backing out or changing his mind about this. And finally, I would just want to point out to the Court, it's true that Mr. Bell admits during his testimony at trial that he kept doing this and stringing Carr along as Sandoval had urged him to because Mr. Bell wanted to make money off of Carr. But there's no evidence in the record at all that Mr. Bell was the one who approached Sandoval in the first place and said, I want to make money off of anybody, or I want to sell firearms to make money. Does the Court have any further questions? Thank you, Your Honors. Roberts. Thank you, counsel. United States v. Bell is submitted.
judges: Kleinfeld, Wardlaw, Collins